# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| KIMBERLY ANN GARDNER, : <br> : <br> Plaintiff, : <br> : <br> v. : <br> : <br> NANCY A. BERRYHILL[1] : <br> Acting Commissioner of Social Security, : <br> : <br> Defendant. : | Civ. No. 16-73-LPS |

Vanessa L. Kassab, DOROSHOW, PASQUALE, KRAWITZ, SIEGEL & BHAYA, Wilmington, DE.

    Attorney for Plaintiff.

David C. Weiss, Acting United States Attorney, and Heather Benderson, Special Assistant United States Attorney, UNITED STATES ATTORNEY'S OFFICE, Wilmington, DE.

Of Counsel: Nora Koch, Acting Regional Chief Counsel, Region III, and Stephen M. Ball, Assistant Regional Counsel, SOCIAL SECURITY ADMINISTRATION, Philadelphia, PA.

    Attorneys for Defendant.

## MEMORANDUM OPINION

September 14, 2017
Wilmington, Delaware

---

[1]Nancy A. Berryhill is now the Acting Commissioner of Social Security. Pursuant to Federal Rule of Civil Procedure 25(d), Nancy A. Berryhill is substituted for former Commissioner Carolyn W. Colvin as defendant in this suit.

[signature]

**STARK, U.S. District Judge:**

## I. INTRODUCTION

Plaintiff Kimberly Ann Gardner ("Plaintiff" or "Gardner") appeals the decision of Defendant Nancy A. Berryhill, the Acting Commissioner of Social Security ("the Commissioner" or "Defendant"), denying Gardner's application for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401–34.[2] The Court has jurisdiction pursuant to 42 U.S.C. § 405(g).

Pending before the Court are the parties' cross-motions for summary judgment. (D.I. 16, 19) Plaintiff seeks reversal and remand, either with instructions to award DIB or for further proceedings, as well as attorney's fees. (D.I. 17 at 2) The Commissioner requests that the Court affirm the decision denying Plaintiff's claim for DIB. (D.I. 20)

For the reasons stated below, the Court will deny Plaintiff's motion for summary judgment and will grant Defendant's motion.

## II. Background

### A. Procedural History

On May 25, 2011, Gardner protectively filed a Title II application for a period of disability and DIB, alleging a disability onset date of April 13, 2010. (D.I. 7 ("Transcript" and hereinafter "Tr.") at 152-61) Gardner's claim was denied on August 31, 2011, and again upon

---

[2]While Plaintiff's Complaint (D.I. 2) alleges that Plaintiff filed a claim for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, Plaintiff's May 25, 2011 application to the Social Security Administration states, "I do not want to file for SSI," and Plaintiff's Opening Brief in Support of Plaintiff's Motion for Summary Judgment (D.I. 17) does not reference SSI. (*See* Tr. at 154, 159; D.I. 17) Accordingly, the Court, like the parties, addresses only Plaintiff's claim for DIB.

reconsideration on April 5, 2012. (Tr. at 83-86, 90-95) Following these denials, Gardner requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. at 97) Gardner's hearing took place on February 18, 2014, and both Gardner, who was represented by counsel, and an impartial vocational expert ("VE") testified. (Tr. at 35-57, 57-60) On March 24, 2015, the ALJ issued a decision in the case, finding that Gardner had two severe impairments – fibromyalgia and a mood disorder – but was not disabled within the meaning of the Social Security Act and could perform jobs that exist in significant numbers in the national economy. (Tr. at 18, 21, 26) Gardner filed a request for review by the Appeals Council, which was denied on December 10, 2015, making the ALJ's decision the final decision of the Commissioner. (Tr. at 1)

On February 10, 2016, Gardner filed a Complaint seeking judicial review of the Commissioner's denial of benefits. (D.I. 2) Gardner moved for summary judgment on May 12, 2017. (D.I. 16) The Commissioner filed a cross-motion for summary judgment on June 12, 2017. (D.I. 19)

### B. Factual History

At the time of her alleged onset of disability, Gardner was 39 years old and defined as a "younger individual" under 20 C.F.R. § 416.963. (Tr. at 26) She has a high school education and past relevant work experience as an administrative assistant, data entry clerk, proofer, and manager. (Tr. at 26) In seeking DIB, Gardner asserted she is unable to work because of bipolar disorder, attention deficit disorder (ADD), and fibromyalgia – but not lumbar and cervical discogenic disease (the "discogenic disease").[3] (Tr. at 199)

---

[3]Lumbar discogenic disease "refers to the gradual deterioration of the discs that separate the large vertebrae in the lumbar spine (lower back)." *Lumbar Discogenic Disease*, Laser Spine Institute (2017), https://www.laserspineinstitute.com/back_problems/spinal_anatomy/lumbar/.

2

1. **Medical History, Treatment, and Conditions**

   a. **Physical Health Evaluations and Treatment**

From 2010 to 2013, Gardner received treatment for her discogenic disease and resulting neck and back pain from multiple doctors. On September 1, 2010, Dr. Laura Manfield, Gardner's primary care physician, determined Gardner had lumbar radiculopathy.[4] (Tr. at 342) Gardner continued to see Dr. Manfield for this condition through 2011. (Tr. at 340, 339) During her January 8, 2011 visit, Gardner was referred by Dr. Manfield to Dr. Eric Ratner. (Tr. at 338) On March 8, 2011, after completing a comprehensive consultation, Dr. Ratner found Gardner suffered from lower back and cervical neck pain and recommended epidural steroid injunctions. (Tr. at 306-07)

Gardner's discogenic disease-related care then shifted to Dr. Randy C. Robinson. Gardner began treatment with Dr. Robinson on May 13, 2011, at which time Dr. Robinson diagnosed her with "significant" cervical and thoracic disc disease and lumbar disc disease, but noted that "medications do help her alleviate approximately 70% to 80% of the pain." (Tr. at 329) Gardner continued to visit Dr. Robinson regularly until April 27, 2012. (*See* Tr. at 329, 334-35, 910-11, 906-07, 902, 899-900, 896-97) At each visit, Gardner's treatment plan remained largely unaltered because Gardner reported "the medications . . . helped] to get her through [the]

---

Similarly, cervical discogenic disease "describes the degeneration of the discs in your spine, specifically in the cervical (upper) region." *Cervical Discogenic Disease–An Overview*, Laser Spine Institute (2017), https://www.laserspineinstitute.com/back_problems/spinal_anatomy/cervical/.

[4]Radiculopathy is an "irritation of or injury to a nerve root (as from being compressed) that typically causes pain, numbness, or weakness in the part of the body which is supplied with nerves from that root." *Radiculopathy*, Merriam-Webster, https://www.merriam-webster.com/medical/radiculopathy.

3

activities of daily living." (Tr. at 330, 332, 911, 907, 903) In particular, during a June 22, 2012 visit, Dr. Robinson indicated Gardner experienced 50-60% relief from pain under her current treatment plan. (Tr. at 893)

On March 6, 2012, Dr. Irwin Lifrak examined Gardner at the request of Disability Determination Services. (Tr. at 425) Gardner reported experiencing "[p]ain extending throughout the entire vertebral column" that "var[ied] from relatively mild to quite severe." (Tr. at 425) Dr. Lifrak diagnosed Gardner with "[d]egenerative joint disease and possible disc damage." (Tr. at 428)

Beginning in August 2012, Dr. Simon Galapo began treating Gardner for her discogenic disease. Like Dr. Robinson, Dr. Galapo saw Gardner approximately every two months from August 2012 to June 7, 2013. (*See* Tr. at 890, 887-88, 883, 878, 865, 860) At each visit, Dr. Galapo continued Gardner on Roxicodone for her pain because Gardner expressed that the medicine "helped] to a significant degree, without side effect or aberrant behavior." (Tr. at 890, 888, 883-84, 879, 866, 861) In particular, on February 15, 2013, Gardner told Dr. Galapo "the medication continues to work quite well for her pain, allowing her to do her activities of daily living." (Tr. at 878)

On April 4, 2013, Dr. Lisa Lescheck-Gelman of Christiana Care Neurology Specialists found Gardner had "constant" but "stable" cervicalgia. (Tr. at 779-80)

Over the course of her treatment, Gardner underwent a number of diagnostic tests. An MRI of her cervical spine from October 4, 2010 revealed "very early degenerative disc disease throughout but no single focal level of significant damage." (Tr. at 295) An MRI from June 22, 2010 showed "degenerative cervical spondylosis," but no spinal narrowing or disc herniation.

4

(Tr at. 286) On September 10, 2010, Gardner's lumbar spine MRI demonstrated a "straightening of the normal lordotic curvature, compatible with muscle spasm" and "broad-based disk bulges" at two locations. (Tr. at 289) A November 8, 2010 cervical spin CT scan revealed "osteophyte and disc protrusion" at two locations as well as degenerative arthritis. (Tr. at 291) Finally, an October 13, 2012 cervical spine MRI showed "mild degenerative discogenic disease of the cervical spine." (Tr. at 754)

### b. Mental Health Evaluations and Treatment

In April 2010, Gardner left her long-time position at the Yellow Book Company and immediately entered inpatient psychiatric treatment programs at Dover Behavioral Health and Fairmount Institute, followed by an outpatient treatment program at MeadowWood. (Tr. at 41, 243, 248, 277) In early 2012, Gardner was admitted to Rockford Center for a one-day hospitalization. (Tr. at 446)

Gardner's most consistent mental health treatment has been with Drs. Cindy Elko and Kimberly Valentine. (*See* Tr. 442-44, 453-553, 581-746, 788-825) On May 21, 2013, Dr. Elko diagnosed Gardner with bipolar disorder and generalized anxiety. (Tr. at 443-44) On August 8, 2012, Dr. Elko conducted a psychiatric diagnostic interview exam. (Tr. at 441-54) Dr. Elko uniformly marked Gardner as "unable to meet competitive standards" in all categories related to unskilled, semi-skilled, or skilled work. (Tr. at 743-44) She also indicated Gardner had "marked" limitations in many categories of functional living and expected Gardner's impairments would cause her to be absent from work four days per month (the highest option given). (Tr. at 745-46)

Throughout 2013, Drs. Elko and Valentine's treatment notes indicate Gardner struggled

5

with bipolar disorder, anxiety, and, at times, hallucinations. (*See, e.g.*, Tr. at 661, 687-88, 734) However, the progress notes also state Gardner was "alert," "presented herself in a neatly dressed and well-groomed fashion," had good eye contact, and was "cooperative and interested." (Tr. at 582, 586, 590, 593, 599, 601, 608, 613, 617, 626, 630, 634, 638, 651, 655, 667) Similar progress notes were made into the winter of 2014. (Tr. at 723, 736-38)

### 2. The Administrative Hearing

#### a. Gardner's Testimony

At the hearing, Gardner testified about her education and work history. (Tr. at 36-38) She testified that she stopped working, in part, due to her declining mental health and has not recently applied for work. (Tr. at 39-41) She also testified that she can sit for 20-30 minutes at a time and can lift 30 pounds, citing picking up her 8-year-old daughter as an example of her ability to lift. (Tr. at 50-51)

Gardner testified that she lives in an apartment with her 8-year-old daughter and 41-year-old sister. (Tr. at 35-36) Gardner does chores around the house and takes care of her daughter with the help of her sister. (Tr. at 47) Gardner testified that she drives at least once a day, primarily to the methadone clinic, as well as to doctors' appointments, the grocery store, and church. (Tr. at 47) Plaintiff testified that she socializes with her family multiple times a week and sees people at church, but has no hobbies or friends. (Tr. at 47-48, 52-53)

As to her mental health, Gardner testified that she has difficulty with short-term memory and anger management. (Tr. at 41) She further testified that she has bipolar disorder and experiences panic attacks, hallucinations, and severe mood swings. (Tr. at 41-42, 54-55) She testified that she struggles to pay attention and lacks motivation for self-hygiene. (Tr. at 56-57)

6

Finally, Gardner testified that has been in therapy with Dr. Elko for a number of years, sees Dr. Valentine as her psychiatrist, and offered a list of her current medications. (Tr. at 43, 45-46)

As to her physical health, Gardner testified that she experiences tremors, has difficulty gripping items, and struggles to sleep. (Tr. at 55-56) Gardner did not bring up – nor did her attorney question her about – any back or neck pain.

### b. Vocational Expert's Testimony

Samuel Edelmann, a VE, testified that Gardner's past relevant work experience included "sedentary and skilled," "sedentary and semi-skilled," and "light and skilled" work. (Tr. at 58)

The ALJ asked the VE to "[a]ssume that [Gardner is] able to perform the full range of light work with the following additional limitations:" "postural activity would be occasional only," "frequent but not constant or repetitive handling, fingering, and feeling," "limited to unskilled work at the SVP 1 to 2 levels," "no more than superficial contract with the public and co-workers," and a "stable" work environment. (Tr. at 58-59)

Based on that hypothetical, the VE testified Gardner would not be able to perform any of her past relevant work. (Tr. at 59) However, the VE testified that there would be a "limited range of cashiering work," as well as work as a toll collector and parking lot attendant, available for a person with the listed limitations. (Tr. at 59) Finally, the VE testified that an inability to maintain regular attendance at work due to psychiatric symptoms would preclude all work. (Tr. at 59) Upon cross-examination by Gardner's attorney, the VE testified that there would be no jobs available for a person who is unable to remember and carry out simple instructions for 20% or more of the workday. (Tr. at 60)

### 3. The ALJ's Findings

7

On March 24, 2014, the ALJ issued the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2015 (Exhibits 3D, 1E, 4E, and 6E).

2. The claimant has not engaged in substantial gainful activity since April 13, 2010, the alleged onset date (Exhibits 3D, 4D, 5D, 6D, 7D, 8D, 2E, 5E, 7E, and hearing testimony) (20 CFR 404.1571 *et seq.*).

3. The claimant has the following severe impairments: fibromyalgia (FMS) (Exhibit 32F); and mood disorder (Exhibit 22F) (20 CFR 404.1520(c)).[5]

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform the full range of light work as defined 20 C.F.R. 404.1567(b), except for the following: the claimant can perform only occasional postural activities; the claimant needs to be limited to unskilled work at the specific vocational profile (SVP) levels 1 to 2, with only superficial contact with the public and coworkers, in a stable work environment, where there are only occasional changes in the workplace; and the claimant can perform frequent, not constant or repetitive, handling / fingering / feeling.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7. The claimant was born on October 15, 1970, and the claimant was 39 years old, which is defined as a

---

[5]Accordingly, the ALJ found that "all other impairments alleged and found in the record are nonsevere." (Tr. at 18)

8

younger individual age 18-49, on April 13, 2010, the alleged disability onset date (Exhibit 1E) (20 CFR 404.1563).

8. The claimant has a least a high school education (12th grade, regular classes), and the claimant is able to communicate in English (Exhibit 2E) (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

11. The claimant has not been under a disability, as defined by the Social Security Act, from April 13, 2010, through the date of this decision (20 CFR 404.1520(g)).

(Tr. at 18-27)

### III. Legal Standards

#### A. Motion for Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n. 10 (1986). A party asserting that a fact cannot be – or, alternatively, is – genuinely disputed

must support its assertion either by citing to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for the purposes of the motions only), admissions, interrogatory answers, or other materials," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)-(B). If the moving party has carried its burden, the nonmovant must then "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita*, 475 U.S. at 587 (internal quotations omitted). The Court will "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

To defeat a motion for summary judgment, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586-87; *see also Podobnik v. U.S. Postal Service*, 409 F.3d 584, 594 (3d Cir. 2005) (stating that party opposing summary judgment "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue") (internal quotations omitted). However, the "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment;" a factual dispute is genuine only where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (internal citations omitted); *see also Celotex Corp. v. Catrett*, 477 U.S.

10

317, 322 (1986) (stating entry of summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial").

**B.     Review of the ALJ's Findings**

The Court must uphold the Commissioner's factual decisions if they are supported by "substantial evidence." *See* 42 U.S.C. §§ 405(g), 1383(c)(3); *see also Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986). "Substantial evidence" means less than a preponderance of the evidence but more than a mere scintilla of evidence. *See Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005). As the United States Supreme Court has noted, substantial evidence "does not mean a large or significant amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988).

In determining whether substantial evidence supports the Commissioner's findings, the Court may not undertake a de novo review of the Commissioner's decision and may not re-weigh the evidence of record. *See Monsour*, 806 F.2d at 1190-91. The Court's review is limited to the evidence that was actually presented to the ALJ. *See Matthews v. Apfel*, 239 F.3d 589, 593-95 (3d Cir. 2001). However, evidence that was not submitted to the ALJ can be considered by the Appeals Council or the District Court as a basis for remanding the matter to the Commissioner for further proceedings, pursuant to the sixth sentence of 42 U.S.C. § 405(g). *See Matthews*, 239 F.3d at 592. "Credibility determinations are the province of the ALJ and only should be disturbed on review if not supported by substantial evidence." *Gonzalez v. Astrue*, 537 F. Supp. 2d 644, 657 (D. Del. 2008) (internal quotations omitted).

The Third Circuit has explained that a "single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence, particularly certain types of evidence (e.g., that offered by treating physicians) – or if it really constitutes not evidence but mere conclusion." *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983). Thus, the inquiry is not whether the Court would have made the same determination but, rather, whether the Commissioner's conclusion was reasonable. *See Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1988). Even if the reviewing Court would have decided the case differently, it must give deference to the ALJ and affirm the Commissioner's decision if it is supported by substantial evidence. *See Monsour*, 806 F.2d at 1190-91.

## IV. DISCUSSION

### A. Disability Determination Process

Title II of the Social Security Act, 42 U.S.C. § 423(a)(1)(D), "provides for the payment of insurance benefits to persons who have contributed to the program and who suffer from a physical or mental disability." *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). A "disability" is defined for purposes of DIB as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. *See* 42 U.S.C. § 423(d)(1)(A). A claimant is disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial

gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A); *see also Barnhart v. Thomas*, 540 U.S. 20, 21-22 (2003).

In determining whether a person is disabled, the Commissioner is required to perform a five-step sequential analysis. *See* 20 C.F.R. §§ 404.1520, 416.920; *Plummer v. Apfel*, 186 F.3d 422, 427-28 (3d Cir. 1999). If a finding of disability or nondisability can be made at any point in the sequential process, the Commissioner will not review the claim further. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

At step one, the Commissioner must determine whether the claimant is engaged in any substantial gainful activity. *See* 20 C.F.R. §§ 404.1520(a)(4)(I), 416.920(a)(4)(I) (mandating finding of nondisability when claimant is engaged in substantial gainful activity). If the claimant is not engaged in substantial gainful activity, step two requires the Commissioner to determine whether the claimant is suffering from a severe impairment or a combination of impairments that is severe. *See* 20 C.F.R. §§ 404.1520(a)(4)(ii) (mandating finding of nondisability when claimant's impairments are not severe), 416.920(a)(4)(ii). If the claimant's impairments are severe, the Commissioner, at step three, compares the claimant's impairments to a list of impairments that are presumed severe enough to preclude any gainful work. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); *Plummer*, 186 F.3d at 428. When a claimant's impairment or its equivalent matches an impairment in the listing, the claimant is presumed disabled. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). If a claimant's impairment, either singly or in combination, fails to meet or medically equal any listing, the analysis continues to steps four and five. *See* 20 C.F.R. §§ 404.1520(e), 416.920(e).

At step four, the Commissioner determines whether the claimant retains the residual functional capacity ("RFC") to perform his past relevant work. *See* 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv) (stating that claimant is not disabled if claimant is able to return to past relevant work); *Plummer,* 186 F.3d at 428. A claimant's RFC is "that which [the] individual is still able to do despite the limitations caused by his or her impairment(s)." *Fargnoli v. Halter,* 247 F.3d 34, 40 (3d Cir. 2001). "The claimant bears the burden of demonstrating an inability to return to her past relevant work." *Plummer*, 186 F.3d at 428.

If the claimant is unable to return to her past relevant work, step five requires the Commissioner to determine whether the claimant's impairments preclude her from adjusting to any other available work. *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (mandating finding of nondisability when claimant can adjust to other work); *Plummer,* 186 F.3d at 428. At this last step, the burden is on the Commissioner to show that the claimant is capable of performing other available work before denying disability benefits. *See Plummer,* 186 F.3d at 428. In other words, the Commissioner must prove that "there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience, and [RFC]." *Id.* In making this determination, the ALJ must analyze the cumulative effect of all of the claimant's impairments. *See id.* At this step, the ALJ often seeks the assistance of a VE. *See id.*

### B.    Issues Raised on Appeal

Gardner raises three arguments on appeal: (1) the ALJ improperly classified Gardner's discogenic disease as non-severe and failed to consider the effect of this disease on Gardner's RFC; (2) the ALJ erred by making two contradictory findings concerning Plaintiff's RFC; and

14

(3) the Commissioner failed to meet her burden to identify jobs in the national economy that Plaintiff can perform.

### 1. Severity of Gardner's Lumbar and Cervical Discogenic Disease

Gardner contends that the ALJ committed legal error by not classifying her discogenic disease as a severe impairment and not considering this impairment in finding Plaintiff non-disabled. (D.I 17 at 13) Specifically, Gardner argues that her multi-year diagnostic and treatment history for discogenic disease shows the ALJ erred by "summarily" finding "all other impairments alleged and found in the record [to be] nonsevere." (D.I. 17 at 11-12) The Court disagrees.[6]

While Plaintiff is correct that the record is "replete" with references to her discogenic disease, those references, which the ALJ considered, indicate that Gardner's pain from the discogenic disease was alleviated and managed by medication. (Tr. at 22-23; *see also* Tr. at 330, 332, 911, 907, 903 (repeatedly stating Gardner's medication would remain unchanged because Gardner stated it helped her perform activities of daily life); Tr. at 890, 888, 883-84, 879, 866, 861) Specifically, the ALJ considered the treatment records of Dr. Robinson and Dr. Galapo, the doctors who most consistently treated Gardner for her discogenic disease, for a combined total of three years. (*See* Tr. at 22-23) The ALJ was permitted to conclude that these records indicate Gardner continued on her prescribed medication because she found "the medication does help to a significant degree, without side effect or aberrant behavior." (Tr. at 22-23) Nor is the Court

---

[6]The Commissioner is correct that, in her brief, Plaintiff "neglects to mention that she has never alleged a cervical or lumbar spinal impairment – not in her DIB application, not in any of her contacts with Agency representatives, and not even at her hearing . . . ." (D.I. 20 at 9) Nonetheless, just as the Commissioner has done, the Court will address Plaintiff's argument as to whether her discogenic disease is severe.

15

persuaded that the ALJ rejected Dr. Lifrak's diagnosis, as the ALJ repeatedly referenced Gardner's discogenic disease in his decision. (Tr. at 22-23) In short, substantial evidence exists to support the ALJ's finding that Gardner's discogenic disease is not a severe impairment.

Gardner further contends that the ALJ erred by failing to consider the effects her discogenic disease on her ability to work. (D.I. 17 at 13) Pursuant to 20 C.F.R. §§ 404.1529 and 416.929, the Commissioner must consider all "symptoms, including pain" in the disability determination. Statements of pain alone are not enough to establish a disability; the claimant must also present objective medical evidence to show that the medical impairment "could reasonably be expected to produce the pain or other symptoms alleged." 20 C.F.R. §§ 404.1529(a); 416.929(a); SSR 96-7p. Once the Commissioner has determined that is the case, then the Commissioner must evaluate the intensity, persistence, and limiting effects of the plaintiff's symptoms to determine how the pain inhibits the claimant's capacity for work. *See* 20 C.F.R. §§ 404.1529(c)(1), 416.929(c)(1); SSR 96-7p.

In determining the limits on the claimant's capacity for work, the Commissioner will consider the entire case record, including evidence from the treating, examining, and consulting physicians, observations from agency employees, and other factors such as the claimant's daily activities, descriptions of the pain, precipitating and aggravating factors, type, dosage, effectiveness, and side effects of medications, treatment other than medication, and other measures used to relieve the pain. *See* 20 C.F.R. §§ 404.1529(c), 416.929(c); SSR 96-7p.

Plaintiff's contention that the ALJ failed to consider the effect of her discogenic disease is not supported by the record. As Plaintiff herself notes, the ALJ "specifically references Ms. Gardner's diagnosis of lumbar and cervical discogenic disease seven times in the 12-page

16

decision." (D.I. 17 at 12) As explained above, the ALJ referenced Drs. Robinson and Galapo's treatment notes, which uniformly report that Plaintiff's pain was responsive to medication, allowing Plaintiff to carry on the activities of daily living without side effects. (Tr. at 22-23) The ALJ further considered medical records demonstrating Gardner presented with "significant discogenic disease" – records that also stated she experienced 50-60% relief through medication. (Tr. at 22-23) Accordingly, the ALJ did consider the effects of Plaintiff's discogenic disease and substantial evidence exists to support the ALJ's evaluation of Plaintiff's capacity for work.

### 2. RFC Findings

Next, Gardner argues that the ALJ committed legal error at step 5 of the disability determination by making two contradictory findings concerning Gardner's RFC: (i) that Gardner "has the residual functional capacity to perform the *full range* of light work as defined in 20 CFR 404.1567(b)," and (ii) that there would be *limitations* on Gardner's ability to perform light work. (D.I. 17 at 2) (emphasis added) According to Gardner, these contradictory statements "cannot be reconciled" and compel a remand. (D.I. 17 at 2)

Plaintiff's characterization of the ALJ's finding is incorrect.[7] In reality, the ALJ made only one pertinent finding: that Gardner "has the residual functional capacity to perform the full range of light work as defined in 20 CFR 404.1567(b), *except for* the following" limitations. (Tr. at 21) (emphasis added) This finding is not contradictory, and requires no guessing as to what the ALJ meant. It is also supported by substantial evidence. Therefore, Plaintiff's second challenge fails.

---

[7]It is not entirely clear whether Plaintiff's second argument pertains to the ALJ's findings in his decision or the hypothetical he posed to the VE. Insofar as Plaintiff's argument is based on the ALJ's hypothetical to the VE, Plaintiff's challenge is taken up below.

### 3. Establishing the Availability of Other Work in the National Economy

Finally, Gardner argues that the Commissioner failed to meet her burden of identifying jobs Gardner can perform that exist in significant numbers in the national economy. She contends that the hypothetical posed to the VE did not incorporate Gardner's discogenic disease and included the ALJ's "contradictory findings" discussed above. (D.I. 17 at 14) Hence, in Gardner's view, the VE's response to the flawed hypothetical cannot constitute substantial evidence.

"Limitations that are medically supported and otherwise uncontroverted in the record, but that are not included in the hypothetical question posed to the expert, preclude reliance on the expert's response." *Rutherford v. Barnhart*, 399 F.3d 546, 554 (3d Cir. 2005) (internal citations omitted). However, "[l]imitations that are medically supported but are also contradicted by other evidence in the record may or may not be found credible – the ALJ can choose to credit portions of the existing evidence, but cannot reject evidence for no reason or for the wrong reason." *Id.* (internal quotations omitted).

Here, Gardner's diagnosis of discogenic disease is medically-supported, but any limitation based on that disease is contradicted by other evidence in the record. As has been repeatedly noted, both by this Court and the ALJ, Gardner's treating physicians found Gardner's discogenic disease to respond well to medication, which allowed Gardner to carry on the activities of daily life. (Tr. at 22-23; *see also* Tr. at 330, 332, 911, 907, 903, 890, 888, 883-84, 879, 866, 861) Again, Gardner did not testify that her neck and back pain limit her abilities, and her treatment history, while making clear that she has discogenic disease, makes equally clear that her resulting pain can be managed with medication. Therefore, substantial evidence exists to

support the ALJ's determination to discount any limitation based on Gardner's discogenic disease in the hypothetical posed to the VE. Accordingly, the VE's testimony constituted substantial evidence on which the ALJ could rely in making his determination that jobs exist in significant numbers in the national economy that Gardner can perform.

The Court further disagrees with Plaintiff's contention that the ALJ's hypothetical contained contradictory statements. The ALJ asked the VE to "[a]ssume that [Gardner is] able to perform the full range of light work *with the following additional limitations*." (Tr. at 58) (emphasis added) The ALJ then went on to list the limitations he wanted the VE to consider. (Tr. at 58-59) The ALJ's statement, like his finding in the decision, was qualified, not contradictory. Additionally, there is no evidence that the VE was confused by the ALJ's question or otherwise struggled to understand the limitations he was to consider in answering the question. *See Howard v. Colvin*, 2015 WL 3794773, at *10 (D. Del. 2015) (rejecting plaintiff's challenge to adequacy of ALJ's hypothetical where there was no evidence of VE confusion).

## V.  CONCLUSION

For the foregoing reasons, neither an award of DIB nor a remand is warranted. The Court will grant Defendant's motion for summary judgment and deny Plaintiff's motion for summary judgment. An appropriate Order follows.